UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

WILLIAM CISNEROS,                                    Case No. 2:23-cv-00248-AB

            Petitioner,                              OPINION AND ORDER

    v.

BRAD CAIN,

            Respondent.

        Susan F. Wilk
        Office of the Federal Public Defender
        District of Oregon
        101 SW Main Street
        Suite 1700
        Portland, OR 97204

            Attorney for Petitioner

        James Aaron
        Oregon Department of Justice
        1162 Court Street, NE
        Salem, OR 97301-4096

            Attorney for Respondent

## INTRODUCTION

Petitioner brings this habeas corpus case pursuant to 28 U.S.C. § 2254 challenging his state-court convictions for four counts of Rape in the First Degree, Sodomy in the First Degree, three counts of Unlawful Sexual Penetration in the First Degree, two counts of Sexual Abuse in the First Degree, and Luring a Minor. For the reasons that follow, the Amended Petition (ECF No. 27) is denied.

## BACKGROUND

### I.    Factual Background

Petitioner was in a romantic and tumultuous relationship with Linda Hock ("Hock") between 2002 and 2009. They lived with two of Hock's children for most of that time, first in California and then in Oregon. Tr. 44-48, 103-04.[1] They had been "heavy" drug users in California and stopped after moving up to Oregon but started "binge" drinking alcohol. *Id*. at 47, 50.

In Oregon, Petitioner and Hock lived in a single-wide, two-bedroom trailer, with a two-car shop next to the trailer. Tr. 48-49. Petitioner and Hock slept in one bedroom, and Hock's older son slept in the second bedroom. *Id*. at 48. They initially converted a dining area to a bedroom for Hock's young daughter ("NJ") but eventually placed her mattress at the foot of their bed for her to sleep. *Id*. at 48-49.

In the Fall of 2007, Hock was arrested for domestic violence against Petitioner and spent about three weeks in jail. Tr. 50-52, 136. About two years later, Petitioner and Hock separated, and Hock moved to California with NJ. *Id*. at 52, 103. Shortly thereafter, and in order to avoid having her probation revoked for drug use, Hock decided to get clean. *Id*. at 53-54. She

---

[1] The trial transcript is found in Respondent's Exhibit 103. Citations are to the original pagination in the upper right corner of each page.

"disassociate[d] with anybody that [she] was hanging out with," took classes to become a drug and alcohol counselor, and stayed clean. *Id*. at 54.

In August of 2012, Petitioner was going to California for work and arranged to visit Hock at her house. Tr. 56-57. NJ, who was then fourteen, came downstairs and said hi to Petitioner, but otherwise stayed upstairs with Hock's phone. *Id*. at 57. Hock went to NJ's room, thinking she was being rude to not spend time with Petitioner, and discovered that NJ had been smoking marijuana. *Id*. at 58, 115-16. NJ had never smoked in the house, and Hock did not allow it. *Id*. at 116. NJ "looked at [Hock] with a weird look and just shrugged her shoulders like . . . a zombie . . . something [was] on her mind." *Id*. Hock assumed NJ was worried that Hock was getting back together with Petitioner, and tried to reassured her that was not going to happen:

> And I said N[], I said, honey, we aren't getting back together. I don't want you – because I could see something was – she had something on her mind. And I said I am not getting back to together. He is just visiting. And she is like no, I am good. I don't want to go down.

*Id*. at 58. Petitioner stayed the night at Hock's house and slept on the couch. *Id*. at 58-59.

The next evening, Petitioner, Hock and NJ went to a restaurant, and NJ whispered in Hock's ear that she did not want to sit next to Petitioner. Tr. 59-60. Hock whispered back, "we are not getting back to together, honey," thinking that NJ worried that, "you know, this is all going to start back up." *Id*. at 60. After dinner, Hock drove everyone to one of Petitioner's family member's home. *Id*. at 60-61. Petitioner rode in the passenger seat with his visor down. *Id*. at 61. Every time Hock glanced at Petitioner, he was "focused on N[J]," watching her through the mirror on his visor. *Id*. Petitioner caught Hock glancing over at him three or four times, and said, referring to NJ, "man, she is pretty. She sure has grown up a lot." *Id*.

Later that evening, Hock and NJ returned home, leaving Petitioner at a family member's house. Tr. 62. NJ disclosed to Hock that Petitioner had molested her:

I was on the couch watching TV. And N[] was up in her room. She comes downstairs and I kind of look up at her. And she looked – I don't know how to describe how she looked. Just her eyes. They were dark and like she had been crying. And she just – she kind of looked like she had seen a ghost.

I looked at her and I go oh, what is – what is wrong? And she says I need to talk to you. And I said N[], what is wrong? And my heart is racing. I knew something was really wrong because she never gets – never talks to me like that.

I said oh, my God, you are pregnant. You know, she is a teen. That is my first thought. She goes no, mom, I am not pregnant. She said I need to talk to you but I need to talk to you in my room because that is my safe place. And I am thinking your safe place?

And with that being said, I didn't – there was a lot of things I didn't know, how kids will word things when they have been abused. I was never abused as a child. I never had any girlfriends that were ever sexually abused so I didn't know red flags. I really didn't know what to – you know, what to look for.

She just kept saying she wanted to go in her room to her safe place. I said just sit down. I can't even get up. My heart is just sunk. And she looked at me and she said mom, Billy molested me. And I said oh, my God. Why didn't you ever say anything? And she said mom, I can't. I couldn't say anything. He told me he would slit my throat.

And I just – I just kept – I probably over and over asked her why didn't you tell me? And she said mom, you don't understand. Billy is a big guy and he told me he would slit my throat if I ever told you. And she told me I never felt comfortable enough before because I was always on drugs or drunk. She said I didn't feel comfortable enough to ever tell you before but I do now. Because I was good in life. And she said seeing Billy tonight just – she said I can't take it. I can't take it anymore. I can't hold it in.

*Id*. at 62-64.

Hock reported the disclosure to police. That same evening, Hock also confronted Petitioner via text message:

"You dirty pig. You are going to burn in hell. You put her through her own hell for so many years. Well, guess what, your hell just got fired up and is burning hot and you are going to be put away for[] life. I have already reported this and there is no turning back. So let's see whose throat is going to get cut now."

Tr. 67. Petitioner responded, "What are you talking about?" *Id*. at 67-68. Then, he called and the two had "a short conversation." *Id*. at 68. Petitioner continued to text Hock, repeatedly apologizing, asking for forgiveness, and referring to his drug use being at fault. *Id*. at 68-69, 74-76.

Sacramento County Deputy Michael Putnam interviewed NJ the next day. Tr. 64, 127. In that interview, NJ disclosed several incidents of sexual abuse, all of which occurred in 2007 while Hock was in jail and NJ was nine years old. Tr. 128, 130, 158. The first incident began with Petitioner calling NJ into the garage, where he was watching a pornographic video on the television. *Id*. at 129. He asked her to sit on his lap and began rubbing her vagina with his hands. *Id*. At one point, Petitioner "became upset because he was having a difficult time doing that," sent NJ to the corner of the garage, "and told her to stimulate herself and get herself ready and then return to him." *Id*. "She did what she was told," and he again rubbed her vagina under her clothing and digitally penetrated her. *Id*. This lasted approximately three hours. *Id*.

Another incident took place two days later, when Petitioner took NJ to a motel close by their home and booked a room. Tr. 130-31. Petitioner took a shower, came out "completely naked," laid NJ down on the bed, removed her pants and underwear, and attempted to have penetrative sex with her. *Id*. at 131. He then sat her up and forced her to perform oral sex on him. *Id*. NJ disclosed other incidents to Deputy Putman, including a time when Petitioner again called her out to the garage while he was watching pornographic videos. *Id*. at 131-132. That time, Petitioner forced her to perform oral sex on him and also performed oral sex on her. *Id*. at 132. NJ recalled three or four other incidents that took place while Hock was in jail, but did not describe the incidents in detail to Deputy Putnam. *Id*.

Sacramento County Detective Carol Mims followed up with a second interview, in which NJ disclosed four incidents of sexual abuse. Tr. 140-41, 145. The first three incidents were largely

the same as those NJ described to Deputy Putnam. *Id*. at 145-48. She added, however, that after the second incident in the garage, she had fallen asleep on the couch watching TV and woken up with Petitioner's fingers inside her vagina. *Id*. at 148-49.

In September 2012, Hock made a pretext, or recorded, phone call to Petitioner. Tr. 76, 78-103, 152-53. Petitioner said he did not to remember what happened, said he "was pretty wasted," "wasn't in my right frame of mind," that he and Hock were both "so drunk," and repeatedly apologized. *Id*. at 78-79. He admitted that he "had porno videos on," that he "d[idn't] remember much at all," and that he was "so sorry that [NJ] has these memories." *Id*. at 80. When asked if he was saying that NJ was lying, Petitioner said, "No. I was drunk back then, Linda." *Id*. He repeatedly apologized, saying, "If it happened I just – I am so sorry," and, "I do not remember that kind of stuff," and "I don't want to recall anything like this. If anything like that ever happened I don't want to recall it." *Id*. at 81-84.

Hock asked how Petitioner could not remember what he did to NJ, and Petitioner responded:

> I am not saying she is lying, Linda. I am saying I don't remember doing any of this. You are asking me to say something about something I don't remember. I do not remember it. I don't, Linda. I don't remember it, Linda. All I did was drink and get drunk and stay up for days and days and days and days. I don't remember it. There is a lot of I totally do not remember and I don't want to remember any part of that life.

Tr. 86-87. Petitioner reiterated: "I am not saying N[] is a liar. I am definitely not saying that. I am just saying that I don't remember it." *Id*. at 88.  When asked if he wanted Hock to tell him what NJ remembered, he said, "No. I don't want to hear it." *Id*. at 89. Petitioner asked to apologize to NJ and Hock called her to the phone, saying "Papa wants to apologize to you." *Id*. at 98. When NJ told him that "these things did happen to me," Petitioner replied:

I am not saying they didn't. I am just saying I don't remember them. Okay? I am
not saying you are a liar. I never called you a liar or anything like that. I would not
say that to you. I am just saying what happened when I was on that much alcohol
and [inaudible...]. Who knows what all I did. And I am so sorry if I hurt you at any
time. Okay.

*Id*. at 101.

Petitioner also sent NJ a Facebook message:

I am sorry I couldn't see you again. N[], I am so sorry for the things in the past. But
too late to change that. But I am glad you can trust your mom. You need to relay -
rely on her in the future.  My life is over without you and your mom in it. But that
is my problem not yours. What you don't know is drugs were a big part of my life
that I never wanted you to see. And it destroyed my family and my life and my soul.
I want to say thank you for being a great person to me. I will always, always every
day regret and pray for forgiveness. I love you and always will and I never will
bother you or your mom again. So sorry. So, so sorry, N[].

Tr. 342-43.

In February 2013, about six months after the initial disclosure, NJ underwent a forensic

interview and examination at the KIDS Center, a multidisciplinary children's advocacy center in

Bend, Oregon. Tr. 210-13. NJ disclosed largely the same information during this interview as she

had to police. *Id*. at 223-26. But she also remembered that Petitioner would call people listed in a

pornographic magazine, and "talk to them about what they should do" to NJ, that she spoke to one

of those people at one point, but that she never actually met anyone. *Id*. at 224-25, 329-30. And,

she described having the symptoms of a urinary tract infection shortly after the incident where

Petitioner inserted his fingers, which can lead to urinary tract infections. *Id*. at 225, 322-23. She

remembered and disclosed one additional incident that occurred when Petitioner had been working

on a barn. *Id*. at 227, 229. In the barn, Petitioner told NJ to perform oral sex on him, and she did.

*Id*. at 227. Because NJ had engaged in consensual intercourse after the abuse, no physical findings

could be attributed to the abuse. *Id*. 317-18, 321-22.

NJ later remembered and disclosed another incident to Deschutes County Detective Merlyn Toney. Tr. 335-36. NJ explained that she had slept on a mattress at the foot of the bed in Hock's and Petitioner's bedroom. *Id*. at 337. The day Hock was arrested, NJ was getting ready to go to bed when Petitioner said that he wanted her to give him oral sex, which she did. *Id*. at 337-38. Afterwards, he made her lay on the mattress, removed her clothing, and inserted his finger in her vagina while he watched pornography on the television. *Id*. at 338.

Detective Toney also interviewed Petitioner. When asked if he knew why the police were talking to him, Petitioner said Hock had called him and said that NJ said that "I did some things with her when I was intoxicated and I don't recall them," that "it is just a big black blur," and that "I was probably not in my right mind." Tr. 383-84. Throughout the interview, Petitioner repeatedly stated he did not remember what happened, and that, at the time, he would often get black out drunk. He admitted to watching pornography in the garage and that NJ had come in on several occasions, but claimed he sent her back into the house. *Id*. at 388-90. Detective Toney asked: "In your mind do you believe what she is saying is true?" and Petitioner replied: "I don't know. I hope not because there is so many things wrong I did." *Id*. at 392-93. When pressed about whether it was possible that abused NJ, Petitioner said: "I hope not. I hope not. Because this is – we are talking about my family here, you know." *Id*. at 398-99. He later admitted to renting a motel room with NJ and to taking her to the barn. *Id*. at 402-04, 406-09.

## II.    Trial Court Proceedings

In March 2013, a Deschutes County Grand Jury indicted Petitioner on several charges, including First-Degree Rape, four counts of First-Degree Sodomy, three counts of First-Degree Unlawful Sexual Penetration, two counts of First-Degree Sexual Abuse, and Luring a Minor. Resp't Ex. 102 (ECF No. 17-1).

NJ testified at trial. She described the incidents of sexual abuse, including being abused the night Hock was arrested, and the incidents that took place in the garage, at a motel and in a barn. Tr. 346-355. She admitted that she had also fabricated allegations of sexual abuse to her brother. *Id*. at 355-57. NJ stated she had never been dishonest with the police and that she had admitted to police that the allegations she made to her brother were not true or had been embellished. *Id*. She could not recall certain details, including what clothing items either she or Petitioner had worn, the reason she went to the garage, or what time of day any of the incidents occurred. *Id*. at 364-73.

The state also offered the testimony of those individuals to whom the NJ disclosed the abuse. Each witness testified about the NJ's disclosures, described above. Several recordings were played for the jury, including Hock's pretext phone call with Petitioner, Tr. 78-103, Detective Mim's recorded interview with NJ, *id*. at 158-90, 196-209, NJ's recorded interview at the KIDS Center, *id*. at 223-88, 297-313, and Petitioner's interview with Detective Toney, with a cautionary instruction about interviewing techniques, *id*. at 375-77, 379-422.

At the close of the evidence, the trial court dismissed one of the counts of Unlawful Sexual Penetration on the State's motion. Tr. 447.

During closing argument, the prosecutor argued to the jury:

> When I talked to you in voir dire I talked a little bit about the evidence being pieces of a puzzle. Every bit of that is that we get - we put into evidence and every single bit of testimony that you heard from somebody up on the stand is a piece of that puzzle. And your job as the jury is to put that puzzle together and see what that picture shows you.

> And in this case you have got the pieces. You have got the pieces to the puzzle and these pieces are clear. They are not favored. Sex abuse cases, child molestation cases do not get better than this unless it is on video or there is a confession and that they are not going to be in trial.

> This is as good as it gets. And it is difficult. It is difficult for everyone involved. And there is a lot at stake. There is a lot at stake for the Defendant and for the victim. One difference being the victim didn't do anything wrong and the

Defendant molested a child. And make no mistake this is a child molester sitting in here with you.

*Id*. at 465-66.

When does that fear go away? When does that fear go away for [NJ]? The fear of not being believed. She comes in here and testified. She is still scared out of her mind. She is throwing up. You get victimized. You get raped by your step-father. You get interviewed by Putnam, by Mims, the KIDS Center. You have got to go through strangers in a Grand Jury. And then you get to get thrown up here. You get to get thrown up here and asked if you are aroused and got wet.

You get victimized over and over and over again. And do you think you want to make this up? Do you think this is a good time for [NJ]? Do you think – was she being [inaudible . . . ] that she is sitting here? Do you think this is her idea of – I was smoking pot in my bedroom. Let me just [inaudible . . . ] and other peoples. Let me just - let me just destroy everything around me.

You know what was the most heart-wrenching, soul crushing statement that you heard on the stand? She is in the bedroom and she sat there and she said I didn't know how to leave. And her face just killed me. Is she – is she recounting, is she recalling, is she killing herself right there or is she the most evil little Meryl Streep you have ever seen from La Pine? She is not. She was tortured. I was torturing her and I have to.

*Id*. at 474-75.

What did [NJ] look like on the stand? Was she up there – was she up there, was she lying to you? Was she making up stories? Or when she was going through these incidents was she recalling them? As best she could as a 14 year old – excuse me, excuse me, as a 16 year old as she stood right here – as a 16 year old recalling what had occurred seven years ago. Recounting for you traumatic memories from seven years ago. And we are going to [inaudible . . . ]. This is slightly different than this. Seven years ago traumatic memories.

I asked her could you be wrong about this? Could you be wrong about why [inaudible . . . ]? Were you wrong about the penis in your mouth? Were you wrong about the attempted sexual intercourse? Absolutely not. Sequencing, maybe. Timing, maybe. She is not on – and she was not lying about the molestation.

*Id*. at 487-88.

Instead of protecting her he molested her and he crushed her in possibly the most damaging way that he could possibly do and why? And why? And what – did you think – think about what he got out of this to what she got out of this? Put that

on a scale. Put on a scale his moment of deviant pleasure from molesting a child to her lifetime. That is what he is willing to do. That is this man.

*Id*. at 490.

> What is her motive to wreck her life for the next years with this? Do you think it is fun? Do you think it is all in the realm of what she would want to be doing sitting up here, total strangers, listening to the most intimate details of being molested as a child when she is still just a young teenager? She is just 16. Can you think of a more insecure time in life than a young teenage girl? That is what she has to go through. That is what he has arranged for her with no reason [inaudible . . . ].

*Id*. at 491.

The prosecutor ended his closing argument discussing Hock's pretext phone call with Petitioner in which Petitioner stated:

> I am not saying she is lying to you, Linda. I would never say that. I am not saying she is lying. I just don't remember. Don't want to remember anything.

Tr. 493. And then discussed Petitioner's recorded interview with Detective Toney:

> Merlyn Toney asks him this question in the interview. So can you tell me why it could have happened? Can't remember. Can you tell me why it could happen? Because I was not in my right frame of mind. I was drinking. I was drunk. I think that was the case. Again, the alcohol. [Inaudible . . . ]. Only go so far as knowing all about the surroundings in getting there and getting the – or getting the room and I can remember even after. I can remember not staying there that night. So I remember getting the motel and I remember not staying there but I just can't remember this little part in between.

> But I am not saying she is lying. I would never say she is lying. That is [inaudible . . . ]. And he is right. She is not lying. She has gone all through this from this day to have you know and deliberate on what happened to her when she was this old.

*Id*. at 494-95.

The defense theory at trial had been that NJ had fabricated the allegations because her mother had caught her smoking marijuana in her room the night Petitioner stayed over. In his closing arguments, defense counsel argued that NJ was not credible given her embellishments, admissions of fabrications, and the absence of corroboration. Defense counsel emphasized that

Petitioner had never admitted to any of the alleged abuse. Tr. at 506-507. Defense counsel argued

that NJ's allegations were incredible, in part because the allegations were limited to the three-week

period when Hock was in jail without any explanation for why the abuse started and ended then,

*id*. at 505-07, and in part because NJ's testimony had "no other support" and was "fraught with

imagination, exaggeration, motive for lying, impossibility," *id*. at 508-19.

In rebuttal closing argument, the prosecutor argued:

> Is she a molested child that came up and had the strength to come and stand in front of you and stand in front of multiple people and talk about it, and the pain that she had to go through, or is she a vile, evil little girl? That is the question. Because she would be evil if she were making this up. Or is she an abused child from the age nine that had the strength to come up at 14?

> And guess what, one of her first fears is being realized – one of her worst fears is being realized right now. Are they going to believe me? And all she can do is pray to God that you get – that you believe what she says, what she has had to say over and over again. That is what she is going though right now. Are they going to believe me? When I spoke out – when I waited five years and I finally spoke out are they going to believe me? It is terrifying, absolutely terrifying.

Tr. 522-23. He continued:

> What I am asking you to do is look at that girl's testimony. I am asking you to believe her. I am asking you to believe her. To believe her that these things happened to her. I am asking you to believe her which is backed up by so much by him.

> I am not saying – he is not saying he doesn't believe her. My God, he is not saying he doesn't believe her. The guy that did it won't say she is lying. His attorney has. But when he was interviewed did he say that she is lying? No. I am not saying she is a liar. I am not saying she is a liar. He is not saying he didn't do it. He just has selective memories.

*Id*. at 525.

At the conclusion of trial, the jury found Petitioner guilty on all remining counts. Tr. 539-

40. The trial court sentenced Petitioner to a total of 600 months imprisonment. Resp't Ex. 101.

### III.    Appellate and Post-Conviction Relief Proceedings

Petitioner filed a direct appeal, arguing the trial court erred by failing to strike the prosecutor's repeated statements that NJ was "not lying" in his closing arguments and by failing to *sua sponte* declare a mistrial. Resp't Ex. 104. The Court of Appeals affirmed without opinion, and the Supreme Court denied review. Resp't Exs. 107, 108.

Petitioner next filed for post-conviction relief ("PCR"). With the assistance of appointed counsel, he filed an Amended Petition raising four claims of ineffective assistance of counsel:

1. Trial counsel failed to object, move to strike, and/or move for mistrial following several statements made by the prosecutor during closing arguments.

2. Trial counsel failed to retain a qualified forensic psychologist to provide trial testimony relating to the child sexual abuse investigation underlying Petitioner's charges.

3. Trial counsel failed to retain and present testimony from a qualified expert to explain that a normally developed [nine]-year-old girl is not capable of making herself "wet" by masturbating.

4. Trial counsel failed to call Petitioner as a witness even though Petitioner made it clear to trial counsel that he wanted to testify.

*See* Resp't Ex. 110 at 8-15.

The PCR court denied relief in a written decision. Resp't Ex. 131. Petitioner appealed the PCR court's denials of his First and Second claims. Resp't Ex. 133. The Court of Appeals affirmed without opinion, and the Supreme Court denied review. Resp't Exs. 136, 137.

### IV.    Habeas Petition

Petitioner filed a *pro se* habeas corpus petition in this Court raising the two claims of ineffective assistance of counsel – that his trial counsel was ineffective in failing to "object during closing argument of the prosecutor" and "retain a forensic interview for the defense investigation." Pet. at 5 (ECF No. 2). After Respondent filed its Response and record in this case, the Court

appointed counsel to represent Petitioner herein. Appointed counsel filed an Amended Petition raising the following grounds for relief:

> **Ground I:** The prosecutor committed prejudicial misconduct in closing argument, violating Mr. Cisneros' Due Process right to a fair trial as secured by the Fifth and Fourteenth Amendments and warranting a mistrial, when the prosecutor (a) vouched for the truthfulness of the allegations, including, but not limited to, repeatedly remarking that the complainant was "not lying about the molestation" and that she was "not lying," and (b) improperly testifying to his personal opinion about the strength of the State's case.

> **Ground II:** Petitioner was denied effective assistance of counsel in violation of his Sixth and Fourteenth Amendment rights when his trial attorney failed to:

>> A. Object to the prosecutor's inflammatory, prejudicial, and flagrantly improper closing argument and rebuttal closing argument including, but not limited to:

>>> 1. Argument that vouched for the complainant's credibility, including argument that repeatedly told the jury that the complainant was "not lying"; that she was fearful of "not being believed"; that she would not "want to make this up"; that she "would be evil if she were making this up"; that "all she can do is pray to God that … you believe what she says, what she has had to say over and over again."

>>> 2. Argument that vouched for the strength of the state's evidence and argued facts not in evidence, including argument that "[s]ex abuse cases, child molestation cases do not get better than this unless it is on video or there is a confession" and "[t]his is as good as it gets."

>>> 3. Argument that was improperly and prejudicially likely to inflame the passions and prejudices of the jury, including argument that the complainant had done nothing wrong, but Mr. Cisneros had molested a child; that "make no mistake this is a child molester sitting in here with you;" that graphically described the fear, trauma, and "torture" the complainant experienced being "victimized over and over again;" and "this was what [Mr. Cisneros] arranged for her for no reason," referring to Mr. Cisneros' exercise of his constitutional right to a trial.

>>> 4. Argument that presented the jury with a false choice, diluting the burden of proof: that to acquit, they would have to conclude that the complainant was "a vile, evil little girl," or they could conclude that she was a "molested child that came up and had the strength to come and stand in front of you and stand in front of multiple people and talk about it," and convict.

B. Retain a forensic child interviewing expert who could have assisted defense counsel in preparing his defense and provided admissible testimony to the jury regarding the proper procedures for reliable forensic interviews of children, the multiple ways in which improper and suggestive interviewing techniques could have impacted the complainant's memory, and common memory fallacies. An expert also could have rebutted the evidence from the forensic psychologist who was called to testify by the State.

Am. Pet. at 2-4 (ECF No. 27).

**DISCUSSION**

## I.    The Merits

An application for a writ of habeas corpus shall not be granted unless adjudication of the claim in state court resulted in a decision that was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court's findings of fact are presumed correct, and Petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). A state court decision is "contrary to . . . clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

Under the "unreasonable application" clause, a federal habeas court may grant relief "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous. *Id*. at 410. Section § 2254(d) "preserves authority to issue the writ in cases where there

is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents. It goes no farther." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

Twenty-eight U.S.C. § 2254(d)(2) allows a petitioner to "challenge the substance of the state court's findings and attempt to show that those findings were not supported by substantial evidence in the state court record." *Hibbler v. Benedetti*, 693 F.3d 1140, 1146 (9th Cir. 2012). A state court renders an unreasonable determination of the facts if it "plainly misapprehends or misstates the record in making its findings or where the state court has before it, yet apparently ignores, evidence that supports petitioner's claim." *Andrew v. Davis*, 944 F.3d 1092, 1107 (9th Cir. 2019) (internal quotations omitted). A federal habeas court cannot overturn a state court decision on factual grounds "unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). This is a "'daunting standard—one that will be satisfied in relatively few cases,' especially because we must be 'particularly deferential to our state-court colleagues.'" *Hernandez v. Holland*, 750 F.3d 843, 857 (9th Cir. 2014) (quoting *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004)).

When applying these standards, the federal court should review the "last reasoned decision" by a state court that addressed the issue. *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004). When a state court reaches a decision on the merits but provides no reasoning to support its conclusion, the federal habeas court must conduct an independent review of the record to determine whether the state court clearly erred in its application of Supreme Court law. *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000). In such an instance, although the federal court independently reviews the record, it still lends deference to the state court's ultimate decision and will only grant habeas relief if the state court's decision was objectively unreasonable. *Richter*, 562 U.S. at 98; *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

### A. Ground One

In Ground One, Petitioner argues that the prosecutor committed prejudicial misconduct during his closing argument when he "(a) vouched for the truthfulness of the allegations, including, but not limited to, repeatedly remarking that the complainant was 'not lying about the molestation' and that she was 'not lying,' and (b) improperly testified to his personal opinion about the strength of the State's case," in violation of Petitioner's due process rights. Am. Pet. at 2.

As an initial matter, in his Brief in Support, Petitioner does not clearly distinguish between arguments supporting his due process claim in Ground One and arguments supporting his ineffective assistance of counsel claims presented in Ground Two. *See* Br. in Supp. at 24-39 (ECF No. 40). Petitioner also quotes extensively from the prosecutor's closing argument arguing both that trial counsel should have objected, and the judge should have otherwise intervened to interrupt the prosecutor's alleged misconduct. *Id*.

Respondent argues that Petitioner has improperly expanded the scope of Ground One to include other portions of the prosecutor's argument beyond what was fairly presented to the Oregon Court of Appeals. Reply at 6 (ECF No. 52). As discussed more fully, below, on direct appeal, Petitioner argued that the trial court erred in failing to *sua sponte* strike the prosecutor's repeated statements that NJ was "was not lying about the molestation" and "She is not lying," or to *sua sponte* declare a mistrial. *See* Resp't Ex. 104. To the extent that Petitioner is now arguing that other portions of the prosecutor's argument were improper or that they were improper for other reasons, he did not advance such a claim on direct appeal. *Compare* Resp't Exs. 104, 106 *with* Br. in Supp. In this regard, he has failed to fairly present those issues to Oregon's state courts. *See* Or. Rev. Stat. §§ 138.071 (requiring direct appeals to be filed within 30 days of entry of

judgment of conviction). Because the time for doing so passed long ago, any expanded scope of Ground One is now procedurally defaulted.

i.  Legal Standards

Prosecutorial misconduct is cognizable in federal habeas corpus. The appropriate standard of review is the narrow one of due process and not the broad exercise of supervisory power. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). A prosecutor commits misconduct if the prosecutor's improper comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id*. (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 642-43 (1974)) (internal citations and quotation marks omitted). Thus, under *Darden*, the first issue is whether the prosecutor's remarks were improper; if so, the next question is whether such conduct infected the trial with unfairness. *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005).

"In fashioning closing arguments, prosecutors are allowed reasonably wide latitude and are free to argue reasonable inferences from the evidence." *United States v. McChristian*, 47 F.3d 1499, 1507 (9th Cir. 1995) (citation omitted). However, a prosecutor may not vouch for the credibility of a witness. *United States v. Sanchez*, 176 F.3d 1214, 1224 (9th Cir. 1999). Improper vouching occurs when the prosecutor places the prestige of the government behind the witness or suggests that information not presented to the jury supports the witness' testimony. *United States v. Parker*, 241 F.3d 1114, 1119-20 (9th Cir. 2001).

Any claim of prosecutorial misconduct must be reviewed within the context of the entire trial. *Greer v. Miller*, 483 U.S. 756, 766 (1987); *Donnelly*, 416 U.S. at 639 (determining whether "remarks, in the context of the entire trial, were sufficiently prejudicial to violate respondent's due process rights"). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 221 (1982).

<ins>ii.  Relevant State Court Proceedings</ins>

On direct appeal, Petitioner argued that the trial court erred in failing to *sua sponte* strike

the prosecutor's remarks that NJ "was not lying about the molestation" and "She is not lying," or

by failing to *sua sponte* declare a mistrial, arguing:

> Here, the prosecutor impermissibly told the jury that N was not lying. Specifically, the prosecutor said, "[S]he was not lying about the molestation" and, "She is not lying." Tr 488, 495.

> The jury is the assessor of the credibility of witnesses, not the prosecutor. The prosecutor's remarks were impermissible and prejudiced defendant. The prosecutor attempted to establish defendant's guilt by sharing with the jury that he, the prosecutor, did not believe that N had lied. It was not only unfair, but it undermined the integrity of defendant's trial. "Such comments dangerously overshadow what * * * defendant's case [was] really about," and this court should "presume that they prejudiced defendant." *State v. Lundbom,* 96 Or App 458, 461–62, 773 P2d 11 (1989). The trial court erred in failing to control the prosecutor's argument. The court should have *sua sponte* struck the offending comments from the record or *sua sponte* declared a mistrial.

Resp't Ex. 104 at 13. In response, the state argued that the prosecutor was discussing the jury's

role in evaluating credibility and offered reasons for why the jury should find the victim credible:

> In the first instance, the prosecutor discussed the jury's role in evaluating the credibility of witnesses and offered reasons, drawn from the evidence in the record, for why the jury should find the victim credible:

>> The term "witness" includes every person who has testified under oath in this case. And every witness has taken an oath to tell the truth and gets up here and testifies. In evaluating each witness's testimony you may consider such things as the manner in which the witness testifies. How did they testify.

>> What did [the victim] look[] like on the stand? Was she up there—was she up there, was she lying to you? Was she making up stories? Or when she was going through these incidents was she recalling them? As best she could as a 14 year old—excuse me, excuse me, as a 16-year-old as she stood right here—as a 16 old recalling what had occurred seven years ago. Recounting for you traumatic memories from seven years ago. And we are going to [inaudible]. This is slightly different than this. Seven years ago traumatic memories.

> I asked her, could you be wrong about this? Could you be wrong about why [inaudible]? Were you wrong about the penis in your mouth? Were you wrong about the attempted sexual intercourse? Absolutely not. Sequencing, maybe. Timing, maybe.[] She is not on—and she was *not lying* about the molestation.

Tr 487-88 (emphasis added).

In the second instance, the prosecutor quoted defendant's out-of-court partial admissions in which defendant conceded that the victim was "not lying," reiterated the victim's lack of motive to lie, and argued that she was not lying:

> But I am not saying she is lying. I would never say she is lying. That is [inaudible]. And [defendant] is right. *She is not lying*. She has gone all through this from this day to have you know and deliberate on what happened to her when she was this old.

Tr 495 (emphasis added).

Resp't Ex. 105 at 7-8. The state argued that neither statement constituted improper vouching because "[t]he prosecutor did not couch his argument in terms of personal belief, opinion or guarantee," but rather permissibly arguing that NJ was credible. *Id*. at 10 (citation omitted). The Oregon Court of Appeals affirmed without opinion, Resp't Ex. 107, and the Oregon Supreme Court denied review without explanation. Resp't Exs. 107, 108.

Relevant to the instant proceedings, Petitioner also presented an ineffective assistance of counsel claim in his PCR proceedings arguing, in part, that the prosecutor's repeated statements that NJ "was not lying," constituted vouching. Resp't Ex. 110 at 9-13. The PCR court concluded that the prosecutor's two statements, that NJ "was not lying about the molestation" and "She is not lying," were not vouching, were not improper, and were not objectionable. Resp't Ex. 131 at 6-7.[2] The Oregon Court of Appeals affirmed the PCR court's judgment without opinion. Resp't Ex. 136.

---

[2] The PCR court determined that "[n]one of the prosecutor's comments constituted impermissible vouching. . . . None of the prosecutor statements indicated that he *personally* vouched for (or

iii.  Analysis

While a written opinion addressing Petitioner's claim presented on direct appeal would have been instructive as to the bases for denying the claim, the lack of such an opinion does not mean Petitioner's claims were not fully adjudicated on the merits. Moreover, by its terms, Petitioner's due process claim is dependent on his claim of ineffective assistance of counsel, adjudicated in his PCR proceedings and presented in the instant Petition. And, as explained more fully below, this Court is bound by the PCR court's determinations of Oregon state law that the prosecutor's statements did not constitute vouching:

> It is not the province of a federal habeas court to reexamine state-court determinations of state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.

*Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *see also Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("a state court's interpretation of state law . . . binds a federal court sitting in habeas corpus."). Thus, in the collateral posture that the instant Petition comes to federal court, the PCR court's determinations of state law is beyond question and must be taken as given. Taken together then, it must be found that the prosecutor's statements did not render Petitioner's trial "fundamentally unfair" in violation of due process since, because the PCR court reasonably found

---

against) any witness . . . ." Resp't Ex. 131 at 6. As to the prosecutor's first statement, "she was not lying about the molestation," the PCR court determined this statement was not vouching:

> Asking a witness if they are lying is not vouching. Commenting on those answers in argument is not vouching. It is fair argument. Particularly when it is simply part of a greater argument about how the jury could tell from the evidence that the victim was testifying truthfully about the abuse. Immediately after this statement, the DDA talks about how there was evidence that corroborated the victim's statements, which would show she was not lying.

*Id*. The PCR court found the prosecutor's second statement, "She is not lying," was neither improper nor the basis for an objection because the prosecutor "was repeating the words of Petitioner when he told both Hock and the police that NJ was not lying." *Id*. at 7.

that the prosecutor's statements that NJ "was not lying about the molestation" and "She is not lying" did not constitute vouching, were not improper and were not objectionable.

Even if this Court were not so constrained by the PCR court's interpretation of state law, it would conclude that only the statement that NJ "was not lying about the molestation" was improper and nevertheless reach the same ultimate conclusion that, in the context of the entire trial, such a statement did not render Petitioner's trial fundamentally unfair. *See Darden*, 477 U.S at 181; *Trillo v. Biter*, 769 F.3d 995, 1001 (9th Cir. 2014) (explaining that habeas relief for misconduct is appropriate "only when the misconduct prejudiced the petitioner[,]" and that courts determine whether a petitioner was so prejudiced by "placing the improper comments in the context of the entire trial"). Petitioner neither admitted nor denied that he abused NJ. He repeatedly stated that he did not think, believe or say that NJ was lying, he repeatedly apologized to NJ, he repeatedly stated he did not remember what happened because of his binge drinking, and he ultimately admitted to renting a motel room with NJ and to taking her to the barn, two locations where NJ alleged that abuse occurred. There is nothing in the record to suggest that either of the prosecutor's statements that NJ "was not lying" had a substantial or injurious effect or influence on the jury in reaching its verdict.

For all these reasons, and upon review of the parties' briefing and a thorough and independent review of the underlying record, this Court finds that the Court of Appeals' rejection of this claim was neither contrary to nor an unreasonable application of clearly established federal law. Accordingly, habeas relief is denied as to Ground One.

### B. Ground Two

In subclaim A of Ground Two, Petitioner argues that trial counsel was ineffective in failing to object to the prosecutor's closing argument. Am. Pet. at 3-4.

In subclaim B of Ground Two, Petitioner asserts that trial counsel was ineffective for failing to retain a forensic child interviewing expert to aid in his defense. Am. Pet. at 4. However, Petitioner concedes that, "in light of trial counsel's detailed explanation of his reason for not presenting expert testimony, [Petitioner] acknowledges that he cannot meet [the Antiterrorism and Effective Death Penalty Act of 1996]'s demanding standard for establishing that counsel's decision fell below prevailing professional norms." Br. in Supp. at 20 n. 1, *see* Resp't Ex. 120 at 3-4. Accordingly, habeas relief is denied as to subclaim B.

i.   Legal Standards

The Sixth Amendment provides defendants with the right to assistance of counsel in all criminal prosecutions, which implies the right to effective assistance of counsel. *Missouri v. Frye*, 566 U.S. 134, 138 (2012). To establish a claim of ineffective assistance under *Strickland v. Washington*, 466 U.S. 668 (1984), a habeas petitioner must satisfy a two-pronged test. First, the petitioner must show that counsel's performance fell below an objective standard of reasonableness. 466 U.S. at 686. Such a showing requires the petitioner to overcome a strong presumption that the challenged conduct falls within the "wide range of reasonable professional assistance; that is the [petitioner] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 689. The first prong thus is satisfied only if "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Id*. at 687.

Second, a petitioner must demonstrate prejudice: "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Id*. Therefore, it is not enough if counsel's errors had only "some conceivable effect on the outcome

of the proceeding." *Id*. at 693. Counsel's errors must have been "so serious as to deprive [the petitioner] of a fair trial, a trial whose result is reliable." *Id*. In making the prejudice determination, the court must "consider the totality of the evidence before the judge or jury." *Id*. at 695.

Where a petitioner alleges that trial counsel was ineffective for failing to raise an objection, he must establish that the decision to forego objection fell below an objective standard of reasonableness, and that if counsel had objected, there is a reasonable probability that the objection would have been sustained and the outcome of the trial would have been different. *See Juan H. v. Allen*, 408 F.3d 1262, 1273-74 (9th Cir. 2005) (noting that counsel is not ineffective for failing to raise a meritless objection). "Because many lawyers refrain from objecting during opening statement and closing argument, absent egregious misstatements, the failure to object during closing argument and opening statement is within the 'wide range' of permissible professional legal conduct." *United States v. Necoechea*, 986 F.2d 1273, 1281 (9th Cir. 1993) (citing *Strickland*, 466 U.S. at 669).

When considering ineffective assistance of counsel claims under 28 U.S.C. § 2254(d), "it is the [petitioner's] burden to show that the state court applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam). Moreover, where a state court has adjudicated an ineffective assistance of counsel claim on the merits, a habeas court's review of a claim under the *Strickland* standard, explained above, is "doubly" deferential. *Harrington*, 562 U.S. at 105-06; *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009).

### i.   Arguments Raised in PCR Proceedings

Petitioner raised this ineffective assistance of counsel claim in his PCR proceedings, identifying numerous statements to which counsel should have objected. *See* Resp't Ex. 110 at 9-

13. Petitioner argued that the prosecutor engaged in impermissibly inflammatory arguments by appealing to the jury's sympathy, disgust and passion and impermissibly vouched for its complaining witness. *Id*. The PCR court addressed Petitioner's claims at length in a written order denying relief. Resp't Ex. 131.

On PCR appeal, Petitioner identified the following statements and arguments in support of his ineffective assistance of counsel claim:

> Here, among other improper statements, the prosecutor argued during closing argument:
>
>> "You know what was the most heart-wrenching, soul crushing statement that you heard on the stand? She is in the bedroom and she sat there and she said I didn't know how to leave. And her face just killed me. Is she – is she recounting, is she recalling, is she killing herself right there or is she the most evil little Meryl Streep you have ever seen from La Pine? She is not. She was tortured. I was torturing her and I have to."
>
> Ex 1, p 477-78.
>
>> "You have got the pieces to the puzzle and these pieces are clear. They are not favored. Sex abuse cases, child molestation cases do not get better than this unless it is on video or there is a confession and that they are not going to be in trial."
>
>> "This is as good as it gets. And it is difficult. It is difficult for everyone involved. And there is a lot at stake. There is a lot at stake for the Defendant and for the victim. One difference being the victim didn't do anything wrong and the Defendant molested a child. And make no mistake this is a child molester sitting in here with you."
>
> Ex 1, p 496.
>
> Those arguments improperly expressed the prosecutor's belief in the complainant's veracity. And, by suggesting that the case was "as good as it gets," the prosecutor improperly referred to other cases outside the evidentiary record. The prosecutor also invited the jury to decide the case on an emotional basis by citing the "torture" the alleged victim experienced by testifying. Such argument was doubly prejudicial, because it also implicitly suggested that petitioner's exercise of his constitutional right to trial was the reason for such "torture."

Resp. Ex. 133 at 28-29 (internal quotation marks and citations omitted). The Oregon Court of Appeals affirmed the PCR court's judgment without opinion. Resp't Ex. 136. Thus, the PCR court's determination that the prosecutor's statements were not objectionable is the last reasoned decision.

### ii.    PCR Trial Proceedings and Decision

In advance of the PCR hearing, defense counsel, Mr. Jacques DeKalb, submitted an affidavit stating that, even "[a]fter reviewing the arguments of the prosecutor, I still believe that the arguments put forth were within the bounds allowed." Respt' Ex. 120 at 2. He acknowledged that the prosecutor's "arguments were strongly worded but no objectionable vouching occurred." *Id*. He explained:

> Objections on my part would have been denied, would have emphasized the prosecutor's points, and would have had no impact on the outcome of the trial. I try not to highlight evidence or arguments with objections if I know that the objection is likely to be overruled or if I feel that it has slipped past the jury without registering strongly.

*Id*. at 3. The PCR court found Mr. DeKalb credible and specifically credited his testimony that he "made a reasonable strategic decision to not object to those arguments," that based on his experience trying "sex related criminal cases for 42 years both as a district attorney and as a defense attorney," he "did not believe that the prosecutor's statements in Petitioner's case were objectionable." Resp't Ex. 131 at 5.

The PCR court concluded that "[n]one of the prosecutor's comments constituted impermissible vouching," explaining:

> A prosecutor's comments constitute vouching only if the prosecutor tells the jury that he or she *personally* believes that a witness was telling the truth, or that the jury should somehow trust the state's assessment of a witness's credibility. Prosecutors are allowed to argue that the state witnesses are telling the truth and why the jury should find them believable. None of the prosecutor's statements

indicated that he *personally* vouched for (or against) any witness, or implied that the state could call only truthful witnesses. An argument suggesting that the victim had no motivation to lie given the trauma she experienced having to go through the criminal justice process and trial is not improper.

Resp't Ex. 131 at 6 (emphasis in original).

Next, the PCR court specifically addressed the prosecutor's statements about the strength

of the state's case:

The statements made by the DDA at page 496 of the transcript were not objectionable, nor did they warrant a curative instruction or a mistrial. The DDA simply stated that the state had a good case. He may have compared it to other generic cases, but that does not mean that it was improper argument. It was essentially a presentation that the evidence made the state's case a strong one. He did not state that he personally believed anything, just that it was a good case. The DDA then went on to argue about the evidence and how it contributed to a strong state's case. The fact that the DDA stated that petitioner was a child molester was the same thing as saying that petitioner was guilty of sexually abusing a child, which is what the entire argument was about.

Resp't Ex. 131 at 6.

The PCR court also discussed the prosecutor's statement regarding NJ's motive:

The DDA did not engage in improper argument when he explained the motivations for the victim *not* to make false allegations of abuse. In his closing argument, petitioner's counsel argued that the victim was making up stories about the sexual abuse, that it did not happen, and that the victim was having fun in making the accusations. Tr. 520. This was [what] the defense presented. In opening statements the defense talked about how the victim's accusations were "fabrications" and "outrageousness." Tr. 42. During his closing arguments trial counsel stated that NJ's testimony has "no other support and it is fraught with imagination, exaggeration, motive for lying, impossibility." Tr. 519. The DDA can legitimately make the counterargument that no victim would ever believe that making false accusations of sexual abuse was fun. In making that argument, the DDA can point out all the various ways that making accusations caused problems, fear, emotional distress, and other negative impacts for the victim.

Resp't Ex. 131 at 6 (emphasis in original).

The PCR court analyzed several of the prosecutor's statements and arguments and

concluded that none were improper or objectionable:

Asking a witness if they are lying is not vouching. Commenting on those answers in argument is not vouching. It is fair argument. Particularly when it is simply part of a greater argument about how the jury could tell from the evidence that the victim was testifying truthfully about the abuse. Immediately after this statement, the DDA talks about how there was evidence that corroborated the victim's statements, which would show she was not lying.

Trial counsel was not inadequate regarding another statement referencing the victim's motive. The DDA is allowed to point out that the victim suffers because of the accusations she has made, and how she has suffered. This is fair argument to demonstrate that she would not have made the accusations if they were not true. It did not constitute vouching. The comment that petitioner claims was a comment on petitioner's exercise of his right to trial did not so clearly state. It is more easily understood as a statement that petitioner's actions in abusing her resulted in her having to disclose, and all the fallout from that disclosure. The DDA did not comment on petitioner's right to a trial, nor did he invite the jury to punish petitioner for going to trial.

When the DDA argued that the victim was not lying he was repeating the words of Petitioner when he told both Hock and the police that NJ was not lying. This was not improper or the basis for an objection.

The DDA did not engage in inflammatory argument or present the jury with an impermissible choice. There was nothing wrong with the DDA arguing to the jury that they had to make a choice, and characterizing NJ in terms similar to what petitioner had used. It was not an effort to inflame the passions of the jury, it was argument designed to demonstrate that the victim did not have any motive to put herself through the trauma that she experienced when she had to undergo multiple interviews and testify before strangers about very embarrassing events.

Resp't Ex. 131 at 6-7.

Finally, the PCR court determined that Petitioner had failed to prove prejudice:

Petitioner has also failed to prove prejudice. Even if the statements made by the DDA were objectionable, petitioner has not proved that there is a tendency that the comments could have affected the outcome of the trial. The jury was fully instructed in a manner that prevented petitioner from suffering the claimed prejudice. The jury was also instructed that they could not be influenced by personal feelings or sympathy. The jury was instructed that they, and only they, determined what the facts were or the credibility of a witness. The jury was also instructed that the statements and arguments of the attorneys was not evidence. Finally, the jury was instructed:

> "In deciding this case you are to consider all the evidence you find worthy of belief. It is your duty to weigh the evidence calmly and

> dispassionately and to decide this case on its merits. Do not allow bias, sympathy or prejudice any place in your deliberations. Do not decide this case on guesswork, conjecture or speculation. Do not consider what sentence might be imposed by the Court if the Defendant is found guilty."

There is no evidence that the jury did not follow the court's instruction.

Resp't Ex. 131 at 7.

### iii.  Analysis

Importantly, the PCR court set out state law conclusions as to whether the prosecutor's statements and arguments were proper or objectionable. The PCR court determined that: 1) "[n]one of the prosecutor's comments constituted impermissible vouching;" 2) the prosecutor's statements regarding the strength of the state's case "were not objectionable;" 3) the prosecutor "did not engage in improper argument when he explained the motivations for the victim *not* to make false allegations of abuse" or when the he "point[ed] out that the victim suffers because of the accusations she has made, and how she has suffered;" 4) asking the victim if she is lying, and commenting on those answers in argument, "is not vouching;" 5) when the prosecutor "argued that the victim was lying . . . . [it] was not improper or the basis for an objection;" and 6) the prosecutor "did not engage in inflammatory argument or present the jury with an impermissible choice." Resp't Ex. 131 at 6-7 (emphasis in original). Such state-law conclusions are binding on a federal habeas court. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[W]e reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Floyd v. Filson*, 949 F.3d 1128, 1146 (9th Cir. 2020) (even a state court's misreading of state law is not a ground for habeas corpus relief); *Mendez v. Small*, 298 F.3d 1154, 1158 (9th Cir. 2002) ("A state court has the last word on the interpretation of state law.") (citing *McSherry v. Block*, 880 F.2d 1049, 1052 (9th Cir. 1989), *cert. denied*, 499 U.S. 943 (1991)).

Consequently, this Court must accept as true the PCR court's determination that the prosecutor's statements and arguments at issue here were not improper and were not objectionable. Taking those conclusions as true, counsel's performance did not fall below an objective standard of reasonableness.

Additionally, it was not objectively unreasonable for the PCR court to conclude that, even if the statements were objectional, Petitioner failed to prove prejudice. Resp't Ex. 131 at 7.  If this Court were not bound by the PCR court's interpretation of state law, it would readily conclude that counsel performed deficiently but would still reach the same conclusion that Petitioner was not prejudiced by his counsel's deficient performance. *See Strickland*, 466 U.S. at 691 ("An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment"); *Lockyer v. Andrade*, 538 U.S. 63, 71, 75 (2003) (Even incorrect state-court decisions must be given deference, unless they are "contrary to" or "objectively unreasonable" applications of a Supreme Court holding). "Arguments of counsel generally carry less weight with a jury than do instructions from the court." *Boyde v. California*, 494 U.S. 370, 384 (1990). The prosecutor's closing argument was not evidence, and the trial court properly instructed the jury specifically on that point prior to closing arguments. Tr. at 448 ("The lawyers' statements and arguments are not evidence."). The jurors presumably followed the trial judge's instructions because "[a] jury is presumed to follow its instructions." *Weeks v. Angelone*, 528 U.S. 225, 234 (2000) (citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)). Petitioner has not rebutted that presumption here.

For all of these reasons, the PCR court's decision is neither contrary to, nor an unreasonable application of, clearly established federal law and habeas relief is denied in its entirety.

## **CONCLUSION**

For the reasons identified above, the Amended Petition for Writ of Habeas Corpus (ECF No. 27) is denied. The Court declines to issue a Certificate of Appealability on the basis that Petitioner has not made a substantial showing of the denial of a constitutional right pursuant to 28 U.S.C. § 2253(c)(2).

IT IS SO ORDERED.

_01/21/2026_
DATE

_Amy M. Baggio_
Amy M. Baggio
United States District Judge